IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION,

     Plaintiff,

vs.

SAN JUAN COAL COMPANY,

     Defendant.

No. 6:08-cv-00613-PJK-LFG

MEMORANDUM OPINION AND ORDER

THIS MATTER comes on for consideration of Defendant San Juan Coal Company's Motion for Summary Judgment filed April 9, 2009 (Doc. 46).  Upon consideration thereof, the motion is well taken and should be granted.

Background

This Title VII gender discrimination claim under 42 U.S.C. § 2000e-2(a) arises from San Juan Coal Company's ("SJCC") employment of Rosie Foster. Plaintiff Equal Employment Opportunity Commission ("EEOC") filed suit on behalf of Ms. Foster, as Title VII authorizes it to do.  42 U.S.C. § 2000e-5(f)(1). Title VII also grants this court jurisdiction.  Id. § 2000e-5(f)(3).

For summary judgment purposes, the court views the evidence in the light

most favorable to the non-moving party as to any disputed facts.  Ricci v. DeStefano, 129 S. Ct. 2658, 2677 (2009).[1]  At the San Juan Mine, an underground coal mine near Farmington, New Mexico, Ms. Foster works as an Operator B for the surface operation.  Doc. 47 at 7, ¶ 19.  The surface operation transports coal to the San Juan Power Plant and removes ash and other byproducts from the power plant.  Doc. 47 at 4, ¶ 3.  Operator B employees operate track dozers, rubber tire dozers, graders, and a small front-end loader.  Doc. 47 at 5, ¶ 11.  Under the operator union's collective bargaining agreement ("CBA") with SJCC, Operator B employees also drive the Operator C classification trucks, which haul coal, ash, or gypsum and may perform other tasks.  Doc. 47 at 5-6, ¶¶ 11-12; Doc. 54 at 16.  When Operator B employees drive Operator C trucks, they receive their normal pay.  Doc. 47 at 6, ¶ 12.  Operator A employees operate a large front-end loader, known as the Prime Loader.  Doc. 47 at 5, ¶ 11.

The CBA governs operators' advancement at the mine, including how SJCC

_____

[1]  In its summary judgment response, the EEOC opens with its own statement of 84 facts spanning 15 pages.  Doc. 54 at 1-15.  Thereafter, in a single dense paragraph spanning five pages, the EEOC responds to SJCC's 61 undisputed facts.  Doc. 54 at 16-21.  Although the local rules allow a non-movant to set forth a statement of numbered disputed material facts, such facts "must state the number of the movant's fact that is disputed."  D.N.M. LR-Civ. 56.1(b).  The EEOC needed to respond thoroughly to SJCC's undisputed facts in a more coherent fashion; it is not the court's job to divine which of the EEOC's facts perform that function.  SJCC contends that the EEOC's theories are like shifting sands and after reviewing the record, Doc. 58 at 1, n.1, the court understands that sentiment.

fills temporary and permanent vacancies, and how operators may advance in their classification.  Doc. 47 at 6-7, ¶¶ 14-17.  To fill a permanent vacancy, SJCC must select the most senior qualified employee who has indicated her desire for that particular position by "bidding" for it.  Doc. 47 at 6-7, ¶¶ 16-17.  The list of employees who have bid for a position, known as the "Bid List," orders employees *by seniority* and describes them as "qualified" or "not qualified."  Doc. 47 at 7, ¶ 17; see Doc. 47, Ex. H.  SJCC may fill temporary vacancies lasting 30 days or less "with any employee whom it selects."  But "[w]henever feasible," SJCC will prefer senior employees.  Doc. 47 at 6, ¶ 15.  In practice, SJCC "would expect" to fill temporary vacancies with the most senior employee on the Bid List "that's available on shift" while also "considering production efficiencies, i.e. mid-shift changes or whatever."  Doc. 54 at 17, SF 15; at Ex. 19 63:20-25.

The operators at the San Juan Mine are grouped into particular crews that rotate among the day, swing, and night shifts.  Doc. 47 at 4, ¶ 5.  Four Production Supervisors rotate among these crews as shift supervisors.  Doc. 47 at 4, ¶ 6.  The Production Supervisors report to the Assistant Superintendent.  Doc. 47 at 4, ¶ 7.

Plaintiff EEOC alleges that SJCC has discriminated against Ms. Foster on account of her gender.  Ms. Foster is a 54-year-old Navajo women employed by SJCC as an Operator B heavy equipment operator.  Doc. 54 at 2, ¶ 1.  This disparate treatment claim involves the terms and conditions of Ms. Foster's employment.  Doc. 47, Ex. A.  Specifically, the EEOC claims that SJCC has: (1)

denied Ms. Foster training opportunities on Operator B equipment while male employees received training; (2) denied her opportunities to operate B equipment and relegated her to driving class C trucks; (3) delayed her qualification training as an Operator A and denied her informal training opportunities on Operator A equipment; and (4) given her fewer opportunities to earn extra pay, known as "scratch up" pay, than men.  Doc. 47, Ex. A. at 1-5.  Further, the EEOC claims: (5) that two of Ms. Foster's Production Supervisors, Billy Phillips and Steve Funk, have made negative comments about her and women in general, and (6) that Mr. Phillips laughed when Ms. Foster and another female operator approached him about becoming "lead persons."  Doc. 47, Ex. A at 3, 5.  A somewhat later claim is that (7) Ms. Foster received less overtime than her male counterparts. Doc. 54 at 11-12, ¶¶ 60-64.  Because the court must first establish the relevant time frame under Title VII's limitations period, additional facts will be set forth when relevant to the merits of each claim.

## Procedural History

This case began when Mary Molina Mescall of the New Mexico Commission on the Status of Women filed a Third-Party Charge of Discrimination on February 8, 2006.  Doc. 47, Ex. D at 2 (charge); Doc. 54, Ex. 24.  Ms. Mescall filed her charge at the suggestion of the EEOC.  Doc. 54 at 1 n.2.  The charge alleged disparate treatment of Navajo females in the terms, conditions, or privileges of employment, and "harassment based on . . . sex and

-4-

gender, female, including but not limited to, condoning an environment that degrades women and denies them leadership opportunities." Doc. 47, Ex. D at 2. After the EEOC investigated and found reasonable cause to believe that SJCC violated Title VII, the EEOC and SJCC engaged in unsuccessful conciliation. Doc. 57 at unnumbered page 7.[2] The EEOC's original complaint alleged that SJCC discriminated against a "class of women . . . with respect to compensation, terms, conditions, and privileges of employment." Doc. 1 at 2, ¶ 7. The EEOC's amended complaint more specifically identified SJCC's discriminatory practices as "denying women opportunities to qualify for and earn . . . 'scratch-up' pay" and "denial of both formal training opportunities . . . and/or the denial of informal training or job assignments." Doc. 16 at 2-3, ¶ 7. The EEOC maintained that it sued on behalf of "a class of women" that "includes at least Rosie Foster, Sandra Lamone, and Emma Curley." Id. at 3, ¶ 8. At some time since the amended complaint, the EEOC narrowed its class to one member, Rosie Foster. Doc. 47 at 2, Ex. A; Doc. 54 at 2, ¶¶ 1-4. SJCC moved for summary judgment. Doc. 46.

## Discussion

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue

---

[2] The Pretrial Order (Doc. 57) is not paginated.

as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2).  The nonmovant may not rest upon its pleadings, but "must . . . set out specific facts showing a genuine issue for trial."  Fed. R. Civ. P. 56(e)(2).  The summary judgment material relied upon by the nonmovant is viewed in the light most favorable to it; however, that material must contain significantly probative evidence that would allow a trier of fact to find in the nonmovant's favor.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986).  A key function of summary judgment procedure "is to isolate and dispose of factually unsupported claims or defenses."  Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).  That is particularly true in this case given the breadth of the administrative charge, the general initial complaint and pretrial order, and the somewhat more focused amended complaint which complains about the denial of scratch-up pay opportunities and training opportunities based upon gender.  Doc. 16 at 2-3, ¶ 7.  Factual disputes about immaterial matters will not preclude summary judgment.  See Anderson, 477 U.S. at 248.

A. Relevant Time Period

Title VII constrains the scope of the allegations relevant to summary judgment.  Charges must be filed within 180 days "after the alleged unlawful employment practice occurred."  42 U.S.C. 2000e-5(e)(1).  But where a charge is filed with the EEOC, as here, "such charge shall be filed by or on behalf of the person aggrieved within three hundred days after the alleged unlawful

employment practice occurred." Id.  The Supreme Court has strictly construed Title VII's time-bar provisions.  Each discrete act of discrimination "constitutes a separate actionable 'unlawful employment practice'" subject to the 300-day time period.  Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 114 (2002). "[D]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges."  Id. at 113.  Therefore, as the Defendant argues, claims arising from discrete acts of discrimination outside of 300-day period from April 15, 2005 to February 8, 2006 are barred.  See Doc. 47 at 18; Haynes v. Level 3 Commc'ns, LLC, 456 F.3d 1215, 1222 (10th Cir. 2006); Morgan, 536 U.S. at 114 ("[O]nly those acts that occurred 300 days before February 27, 1995, the day that Morgan filed his charge, are actionable.").

Neither party addresses the Lilly Ledbetter Fair Pay Act of 2009 which in certain circumstances may allow claims that otherwise would be barred and extends the time for back pay.  The Act amended § 706(e) of Title VII, 42 U.S.C. § 2000e-5(e) to add subsection (3):

> (3)(A) For purposes of this section, an unlawful employment practice occurs, with respect to discrimination in compensation in violation of this title, when a discriminatory compensation decision or other practice is adopted, when an individual becomes subject to a discriminatory compensation decision or other practice, or when an individual is affected by application of a discriminatory compensation decision or other practice, including each time wages, benefits, or other compensation is paid, resulting in whole or in part from such a decision or other practice.
> (B) In addition to any relief authorized by section 1977A of the Revised Statutes (42 U.S.C. 1981a), liability may accrue and an

> aggrieved person may obtain relief as provided in subsection (g)(1), including recovery of back pay for up to two years preceding the filing of the charge, where the unlawful employment practices that have occurred during the charge filing period are similar or related to unlawful employment practices with regard to discrimination in compensation that occurred outside the time for filing a charge.

42 U.S.C. § 2000e-5(e).  The Act applies retroactively to all discrimination in compensation claims pending on or after May 28, 2007.  Pub. L. No. 111-2, § 6, 123 Stat. 5.  Expressly intended to "reinstate the law regarding the timeliness of pay compensation claims" as it existed prior to the Supreme Court's decision in Ledbetter v. Goodyear Tire & Rubber Co., 550 U.S. 618 (2007), the Act made each paycheck received during the limitations period "an unlawful employment practice" if it "reflect[s] a periodic implementation of a previously made intentionally discriminatory employment decision or 'other practice.'"  Mikula v. Allegheny County, 583 F.3d 181, 184, 186 (3d Cir. 2009).

The Act does not alter the 300-day limitations period.  All of the EEOC's allegations might be characterized as compensation claims in an abstract way (the lack of training and operation opportunities may eventually, cumulatively prevent Ms. Foster from earning a raise).  While it appears that the denial of scratch-up or overtime pay might qualify as a compensation claim, this case simply does not involve claims that would be foreclosed but for the new rule.  Moreover, "[t]he rule set out in Ledbetter and prior cases—that 'current effects alone cannot breathe new life into prior uncharged discrimination'—is still binding law for

Title VII disparate treatment cases involving discrete acts other than pay." Leach

v. Baylor Coll. of Medicine, Civil Action No. H-07-0921, 2009 WL 385450, at

*17 (S.D. Tex. Feb. 17, 2009).

      The denial of training and operating opportunities claims are more akin to

failure-to-promote claims.  Courts have largely found that, after Ledbetter,

"failure to promote claims are still time-barred if the plaintiff does not file an

EEOC complaint within 300 days of the discriminatory action." Harris v.

Auxilium Pharm., Inc., Civil Action No. 4:07-cv-3938, — F. Supp. 2d —, 2009

WL 3157275, at *29 (S.D. Tex. Sept. 28, 2009) (collecting cases).  The exclusion

of failure-to-promote claims is consistent with the Act's rationale: to make each

individual compensation decision actionable because plaintiffs "are often initially

unaware that they are being paid an unequal wage: the discrimination can take

years to identify." Id. at *31 (citing Ledbetter, 550 U.S. at 649 (Ginsburg, J.,

dissenting)).  Conversely, although the EEOC argues otherwise, Doc. 54 at 23,

this case really involves discrete acts of alleged disparate treatment.  Moreover,

the real or imagined discriminatory nature of these acts should have been

apparent—though the EEOC would have SJCC defend decades of operating

decisions involving Ms. Foster and others, such discrete acts must be within the

limitation period and exhausted.  See Annett v. Univ. of Kan., 371 F.3d 1233,

1238 (10th Cir. 2004) (exhaustion); Martinez v. Potter, 347 F.3d 1208, 1210-11

(10th Cir. 2003) (applying Morgan to incidents occurring after the filing of the

EEOC charge).

As noted, the Act does not extend the limitations period on the scratch-up or overtime pay claims. Ms. Ledbetter's own situation demonstrates why. Ms. Ledbetter alleged that her employer paid her less than men on account of her gender over the course of her 19-year career. <u>Ledbetter</u>, 550 U.S. at 621-22. Ms. Ledbetter's employer had paid her only twice during the relevant 180-day period, but Ms. Ledbetter alleged discriminatory intent *before* the charging period. <u>Id.</u> at 624. She argued that "it is sufficient that discriminatory acts that occurred prior to the charging period had continuing effects during that period." <u>Id.</u> at 625. The Court rejected this argument: "A new violation does not occur, and a new charging period does not commence, upon the occurrence of subsequent nondiscriminatory acts that entail adverse effects resulting from the past discrimination." <u>Id.</u> at 628. The Act abrogated this holding so that each pay decision "reviv[es] a claim that otherwise would have been time-barred because of a failure to exhaust administrative remedies within 180 days of the original discriminatory compensation decision or practice." <u>Johnson v. District of Columbia</u>, 632 F. Supp. 2d 20, 22 (D.D.C. 2009).

The EEOC's scratch-up and overtime pay claims do not require revival as Ms. Ledbetter's claims did: the EEOC alleges discrete acts of discrimination regarding scratch-up and overtime pay during the 300-day limitations period. By their nature scratch-up and overtime pay are not continuous. The Act changed

only which discrete acts constitute unlawful employment practices *during* the
window.  However, for purposes of damages, the court would include "back pay
for up to two years preceding the filing of the charge, where the unlawful
employment practices that have occurred *during the charge filing period*" are
similar to those practices outside the period.  42 U.S.C. § 2000e-5(e)(B)
(emphasis supplied).  For liability purposes, the EEOC has alleged discrete acts of
discrimination concerning scratch-up and overtime pay and only those discrete
acts that occurred during the 300-day window are relevant.

    The EEOC attempts to avoid the 300-day limitations period by claiming
that the "acts in this case are part of the hostile work environment claim."  Doc.
54 at 22.  The EEOC correctly states the law: that separate acts composing a
hostile work environment claim "collectively constitute one 'unlawful
employment practice.'"  <u>Morgan</u>, 536 U.S. at 117.  Because a hostile work
environment is continuous, it "does not matter . . . that some of the component
acts . . . fall outside the statutory time period.  Provided that an act contributing
to the claim occurs within the filing period, the entire time period of the hostile
environment may be considered by a court."  <u>Id.</u>; <u>Tademy v. Union Pac. Corp.</u>,
520 F.3d 1149, 1156-57 (10th Cir. 2008) (adopting framework to analyze hostile
work environment claims).

    Perhaps the EEOC could have relied on acts outside the 300-day window
had it alleged a hostile work environment in its pleadings before now.  Instead,

the hostile work environment theory appears for the first time in the EEOC's response.  Doc. 54 at 21-22.  Neither the original complaint (Doc. 1) nor the amended complaint (Doc. 16) alleged a hostile work environment.  Tellingly, the pretrial order also lacks such a theory.  Doc. 57 at 3-5.  The EEOC is limited to the claims and theories described in the pretrial order.  Fed. R. Civ. P. 16(d); Wilson v. Muckala, 303 F.3d 1207, 1215 (10th Cir. 2002) ; see also Cortez v. Wal-Mart Stores, Inc., 460 F.3d 1268, 1276-77 (10th Cir. 2006) (same).  Disparate treatment and hostile work environment are "two separate Title VII theories."  Strickland v. United Parcel Service, Inc., 555 F.3d 1224, 1230 n.4 (10th Cir. 2009).  Accordingly, the EEOC's disparate treatment theory is limited to discrete acts that occurred during the 300 days before it filed—between April 15, 2005 and February 8, 2006.  Although the EEOC relies upon several subsequent incidents of allegedly disparate treatment, these claims simply cannot substitute for timely claims.  Martinez, 347 F.3d at 1211.

    B. Title VII

    It is "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex."  42 U.S.C. § 2000e-2(a)(1).  In an employment discrimination case, a plaintiff may rely upon direct or indirect evidence of discrimination.  See Adamson v. Multi Cmty. Diversified Servs., 514 F.3d 1136, 1145 (10th Cir. 2008).  A plaintiff relying

solely on indirect evidence of disparate treatment may make out a prima facie
case by showing that she (1) belongs to a protected class, (2) suffered an adverse
employment action, and (3) received disparate treatment compared to similarly
situated employees.  See Orr v. City of Albuquerque, 417 F.3d 1144, 1149 (10th
Cir. 2005).  Although the burden of showing the prima facie case is light, the
EEOC was required to develop some evidence of comparability concerning the
characteristics of the employees it contends were treated more favorably than Ms.
Foster.  See Patterson v. Avery Dennison Corp., 281 F.3d 676, 680 (7th Cir.
2002) (stating that a similarly situated employee is one "directly comparable to
[the Plaintiff] in all material respects.").  Thereafter, the burden of production
shifts to the defendant employer "to articulate some legitimate, nondiscriminatory
reason for the employee's rejection."  McDonnell Douglas Corp. v. Green, 411
U.S. 792, 802 (1973); see also St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507
(1993).

Upon such a showing, a plaintiff may avoid summary judgment by showing
that the proffered reason is pretextual, unworthy of belief.  See McDonnell
Douglas, 411 U.S. at 804; Adamson, 514 F.3d at 1146.  A plaintiff is not required
to present evidence of discriminatory intent at the pretext stage to avoid summary
judgment.  See Randle v. City of Aurora, 69 F.3d 441, 451 (10th Cir. 1995); see
also Conner v. Schnuck Mkts., Inc., 121 F.3d 1390, 1397 n.6 (10th Cir. 1997).  A
non-exhaustive list of evidence that may demonstrate pretext includes: "prior

treatment of plaintiff; the employer's policy and practice regarding minority

employment (including statistical data); disturbing procedural irregularities (e.g.,

falsifying or manipulating hiring criteria); and the use of subjective criteria."

Simms v. Oklahoma ex rel. Dep't of Mental Health, 165 F.3d 1321, 1328 (10th

Cir. 1999).  The pretext evidence, however, must be sufficient for a reasonable

jury to conclude that the employer's proffered reason for the failure to promote is

unworthy of belief.  See id. at 1328-29.

     1. Prima Facie Case

     a. Protected Class

     The parties agree that, as a female, Rosie Foster belongs to a protected

class under Title VII.  Doc. 57 at 8.

     b. Adverse Employment Action and Disparate Treatment

     No exhaustive list of adverse employment actions exists.  Rather, courts

must determine them on "'a case-by-case approach, examining the unique factors

relevant to the situation at hand.'"  Stinnett v. Safeway, Inc., 337 F.3d 1213, 1217

(10th Cir. 2003) (quoting Sanchez v. Denver Pub. Sch., 164 F.3d 527, 532 (10th

Cir. 1998)).  "Conduct rises to the level of 'adverse employment action' when it

'constitutes a significant change in employment status, such as hiring, firing,

failing to promote, reassignment with significantly different responsibilities, or a

decision causing a significant change in benefits.'"  Id.  "[A] 'mere inconvenience

or alteration of responsibilities,'" however, is not an adverse employment action.

Id.  The Tenth Circuit has stated that adverse actions include "those acts that carry a significant risk of humiliation, damage to reputation, and a concomitant harm to *future employment prospects*."  Hillig v. Rumsfeld, 381 F.3d 1028, 1032 (10th Cir. 2004) (internal quotations omitted).

In its answers to interrogatories, the EEOC claims that SJCC took various adverse employment actions against Rosie Foster: denied her task training opportunities on B equipment, relegated her to driving trucks; denied her opportunities to earn "scratch up" pay; and delayed her qualification training for Operator A classification.  Doc. 47, Ex. A at 1-5.  Although these allegations could relate to Ms. Foster's qualification for promotion, the EEOC *does not challenge* SJCC's failure to promote her.  Doc. 54 at 28 n.7.  The EEOC accepts that Ms. Foster was not qualified for the Operator A classification and was therefore ineligible.  Doc. 54 at 28 n.7.

I. Task Training on B Equipment

Task training is the federally mandated training that an employee must receive before operating new or modified equipment.  Doc. 47 at 7-8, ¶ 20.  If an employee previously received task training on a particular piece of equipment, but has not operated that equipment within the last twelve months, he must again receive task training before operating the equipment.  Doc. 47 at 7-8, ¶ 20. Neither the CBA nor any seniority system governs task training, but rather SJCC gives task training when it sees fit.  Doc. 47 at 8, ¶ 22.

The EEOC identifies various instances of males receiving task training when Rosie Foster did not.  The parties apparently agree that the EEOC has identified eleven such instances during the 300-day window.  Doc. 47 at 20; Doc. 54 at 27.  But after examining the underlying interrogatory answers, Doc. 47, Exs. A (supplemental answers) & B (initial answers), this court counts only six instances between April 15, 2005 and February 8, 2006 among the many that the EEOC cites as disparate treatment.  The EEOC initially identified three instances of "males with less seniority" receiving training: Paul Jones's May 2005 track dozer training, Billy Clyde's October 3, 2005 blade training, and Dave Bruce's October 17, 2005 track dozer training.  Doc. 47, Ex. B at 7.  Without more, however, these allegations show only that these men received training on those dates, and no relation to Ms. Foster.  The EEOC supplemented with six occasions during the 300-day window when "Ms. Foster has not received the training . . . which was received by male operators": Robert Hawkins's April 15, 2005 training, Jay Yazzie's April 29, 2005 training, Oscar Chischilly's July 9, 2005 training, Thomas Begay's August 14, 2005 training, Jay Yazzie's October 18, 2005 training, and Larry Tsosie's February 4, 2006 training.  Doc. 47, Ex. A at 1-3.  All other complained-of instances of task training occurred outside the 300-day window: before April 15, 2005 or after February 8, 2006.

The lack of task training may be an adverse employment action under certain circumstances.  But the lack of task training is not adverse on its face.

Task training on any particular piece of equipment does not earn Ms. Foster any additional pay, Doc. 47 at 8-9, ¶ 25, nor is it necessary for qualification training for Operator A classification.  The EEOC argues, however, that the denial of task training may harm Ms. Foster's future employment prospects because "skill development on B equipment will help an employee trying to learn to operate the [A] Loader."  Doc. 54 at 8, 26; see also id. at 3, ¶¶ 6-7.  Therefore, a denial of task training may be an adverse employment action.

But the EEOC does not allege any affirmative denial, but merely the overall lack of task training opportunities.  Because SJCC's task training assignments are discretionary, made on an as-needed basis specific to that shift, Doc. 47 at 8, ¶ 22, giving task training to one operator during a particular shift is not necessarily adverse to Ms. Foster: she may not be working then, she may not be available for training, she may be receiving task training on another piece of equipment herself, or any other reason may exist.  Further, this court doubts whether not receiving task training on a particular date is even an action; if anything it seems more like inaction.  Therefore, in order for a given instance of a male receiving task training to amount to an adverse employment action, the EEOC must show that Ms. Foster was working that particular shift, that Ms. Foster was available for training, and that Ms. Foster was ready and willing to receive that training at that time.

The EEOC has not shown Ms. Foster's availability for task training on the

specific occasions of SJCC's alleged adverse employment actions.  SJCC

contends that on six of eleven occasions identified by the EEOC, Ms. Foster was

not working those shifts.  Doc. 47 at 10, ¶ 27.  Plaintiff, which bears the burden

of proof, does not refute this, instead asking that the court strike this undisputed

fact because SJCC does not identify which of the six occasions is involved, nor

support it with admissible evidence.  Doc. 54 at 18.  To be sure, SJCC might have

been more precise in identifying which occasions, but the EEOC supplied the

dates involved, and the statement is supported by SJCC human resources

personnel.  The court will not strike this undisputed fact.

Further, three of the six instances were clearly not adverse employment

actions.  During Oscar Chischilly's training on a portable steam cleaning device

on July 9, 2005, Ms. Foster operated a track dozer, a piece of B equipment.  Doc.

47 at 10, ¶ 26(ix); Doc. 54 at 18, SF 26(ix).  According to the EEOC's

allegations, operation of B equipment should improve Ms. Foster's skills for

future operation of the A loader.  Doc. 54 at 8, ¶ 41.  About two weeks before Jay

Yazzie's October 18, 2005 task training on a track dozer, Ms. Foster received task

training on that very piece of equipment.  Doc. 47 at 9, ¶ 26(viii), 22; Doc. 54 at

18, SF 26(viii).[3]  Ms. Foster had the same training opportunity as Mr. Yazzie did

---

[3]  Although the EEOC moves to strike this undisputed fact, it is supported
by SJCC's human resources personnel.  See Doc. 47, Ex. G, ¶23.  The court will
not strike this fact.

within a short period of time.  Finally, on August 14, 2005, the same day that

Thomas Begay received task training on a truck (C equipment) and a motor grader

(B equipment), Ms. Foster received task training on the coveted Prime Loader.

Doc. 47 at 10, ¶ 27; Doc. 54 at 18, SF 27.  Receiving the very A equipment

training that she desired cannot be an adverse employment action.  Giving task

training to males on these three particular occasions did not constitute adverse

employment actions.

      In passing, the EEOC implies that anything short of "training on all heavy

equipment which Operator B's may use" is an adverse employment action.  Doc.

54 at 27.  The EEOC points to various types of equipment on which Ms. Foster

has not received task training.  Doc. 54 at 9-10.  Again, in light of SJCC's "as

needed" task training policy, the EEOC must show that task training was needed

during a particular shift, and that Ms. Foster was present and available.  It has not

done so.  In fact, the EEOC's own witness, Cynthia Steigelman, one of four

Production Supervisors at San Juan Mine, testified in her deposition that she has

not had the *opportunity* to provide Ms. Foster training on the "low boy"

equipment.  Doc. 54, Ex. 12 at 62:3-6.  Alternatively, even if SJCC's failure to

train Ms. Foster on every piece of B equipment were an adverse employment

action, the EEOC has not alleged that SJCC gave any male employee that

thorough training.  Therefore, the EEOC could not show disparate treatment and

meet its very minimal burden of a prima facie case with respect to task training

on B equipment.

    ii. Repeated Assignments to Drive Trucks

    The EEOC alleges that SJCC discriminates against Ms. Foster by frequently assigning her to drive trucks, an Operator C task, "more often than some of her male coworkers."  Doc. 54 at 2, ¶ 2.  "Some men work only on B equipment and never drive trucks and some men rarely operate trucks."  Doc. 54 at 2, ¶ 2.  Because Ms. Foster "is relegated to driving ash trucks instead of operating A Loaders or other heavy equipment," the EEOC alleges, she is deprived of skill development, which in turn harms her prospects to qualify as an A operator.  Doc. 54 at 26.  Operating trucks is a responsibility of B operators.  Doc. 47 at 15, ¶ 52; Doc. 54 at 20, SF 52 (admitting that B operators do operate trucks as well as heavy equipment within the B class).

    SJCC's frequent assignment of Ms. Foster to truck driving is not an adverse employment action.  The argument that SJCC's action is adverse to Ms. Foster is more attenuated than the claim that the lack of task training is an adverse action. With the lack of task training, the EEOC could at least cite discrete occasions when male operators received training and Ms. Foster did not.  The EEOC could also specify which pieces of equipment for which Ms. Foster had not received current task training.  The EEOC cannot point to any specific deprivations here. Instead, it alleges that Ms. Foster's frequent performance of one aspect of her job responsibilities is somehow discriminatory.  Surely the EEOC does not mean that

her job description is discriminatory.  Rather, the repetitive assignments to truck duties must, at some point, *become* discriminatory by accumulation.  In other words, driving trucks 50 times a year was not adverse, but the 51st and subsequent times were adverse.  This insignificant harm does not rise to the level of a "significant change in employment status."  Stinnett, 337 F.3d at 1217.  Ms. Foster receives the same pay and benefits when she drives trucks.  Doc. 47 at 16, ¶ 53; Doc. 54 at 20 SF 53.  For that matter, it does not even rise to an "alteration of responsibilities," which is *not* an adverse employment action.  Stinnett, 337 F.3d at 1217.

The facts that Ms. Foster *enjoys* driving trucks and never complained about her truck assignments to her direct supervisors reinforce the insignificance of the alleged harm.  Doc. 47, Ex. C at 44:25-45:10, 244:12-20.  Although ostensibly not challenging the lack of promotion to Operator A, the EEOC's argument is that driving truck is an adverse employment action because  more frequent assignments to B equipment would have sufficiently developed Ms. Foster's skills so that she would have qualified as an A operator.  Doc. 54 at 24, 28 n.7.  This argument is highly speculative: the EEOC has offered nothing but conjecture to show that any amount of skill development would have resulted in Ms. Foster's qualification as an A operator.  That Ms. Foster received six weeks of field training and still did not qualify as an A operator strongly indicates that additional skill development would not have helped.  Doc. 47 at 12, ¶ 37, 15, ¶

48-49; Doc. 54 at 19, SF 37.

Even if Ms. Foster's frequent assignment to truck driving were an adverse employment action, the EEOC has not shown that SJCC treats her differently than similarly situated male employees.  The EEOC offers generalized statements that *some* men never drive trucks and that *some* men rarely drive trucks, Doc. 54 at 2, ¶ 2, and the personal impressions of Cynthia Steigelman, a Production Supervisor at San Juan Mine, that men have more opportunities to operate heavy equipment than women, particularly Harry Bennally, Lexcey Arviso, and Thomas Begay. Doc. 54 at 9, ¶ 44, 14-15, ¶¶ 83-84, 24, Ex. 12 at 119-27.  The EEOC must offer more specific, substantiated comparisons between Ms. Foster and these three operators, showing that they are "directly comparable to [the Plaintiff] in all material aspects," such as their relative qualifications and availability on particular shifts.  Without such comparisons, the EEOC's broad contentions do not sufficiently show that Ms. Foster is similarly situated to these male operators.

The EEOC's allegations that SJCC discriminated against Ms. Foster by repeatedly assigning her to drive trucks are insufficient as a matter of law to make out a prima facie claim of discrimination, because the EEOC has not shown an adverse employment action or disparate treatment.

iii. Scratch-Up Pay Opportunities

The EEOC alleges that SJCC denied Ms. Foster opportunities to earn increased pay known as "scratch up" pay.  Doc. 16 at 2-3; Doc. 47, Ex. A at 5;

-22-

Doc. 54 at 31.  SJCC operators have opportunities to earn "scratch up" pay when they operate equipment in a higher classification.  Doc. 47 at 10, ¶ 29.  SJCC is supposed to give "scratch up" opportunities according to seniority where feasible, according to the CBA.  Doc. 47 at 11, ¶ 30.  In practice, the EEOC alleges, employees expect that the most senior operator on the Bid List would have priority for temporary vacancies.  Doc. 54 at 17, SF 15.  However, SJCC admits that during the 300-day window "male operators whose names were not on the bid list scratched up twenty-eight times."  Doc. 47 at 11, ¶ 33.  The EEOC does not dispute this figure.  Doc. 54 at 17, SF 23.  The EEOC also points to Ms. Foster's "minuscule" number of hours "compared to male Operator B employees."  Doc. 54 at 31.

The crucial fact, of course, is how SJCC treated similarly situated male employees.  SJCC admits that it repeatedly (and mistakenly) selected for scratch up pay operators not on the Bid List instead of the most senior operator on the Bid List who was on shift at that time.  Doc. 47 at 11, ¶¶ 33-34; Ex. G, ¶¶ 25-28.  SJCC "passed over" Rosie Foster (meaning that she was the most senior operator on the Bid List working that particular shift) nine times during the 300-day window.  Doc. 47 at 11, ¶ 33.  It also passed over three male employees senior to Ms. Foster whose names were on the Bid List.  During the 300-day window, SJCC passed over Jay Yazzie 12 times, Al Alston 9 times, and Oscar Chischilly 3 times.  Doc. 47 at 11, ¶ 33.  The EEOC does not dispute these figures, but rather

-23-

argues that Mr. Alston and Mr. Chischilly were not similarly situated to Ms. Foster because they were both qualified as A operators during that period.  Doc. 54 at 19, SF 33.  Mr. Alston and Mr. Chischilly were still similarly situated, however, for the question of whether SJCC also passed over male operators who were the most senior operators on the Bid List on shift at that time.  They, along with Mr. Yazzie, were situated similarly to Ms. Foster.  Further, their total hours of scratch up pay are irrelevant to the question of disparate treatment of the most senior operator on the Bid List on shift at that time.  Because SJCC passed over similarly situated operators as frequently, or even more frequently, than it passed over Ms. Foster, the EEOC cannot show that SJCC treated Ms. Foster differently than similarly situated male employees with respect to scratch up pay.[4] Therefore, the EEOC cannot show a prima facie case of discrimination with respect to scratch up pay.[5]

    iv. Qualification Training for A Operator

---

[4]  The EEOC also claims that Ms. Foster's training opportunities on the A loader were limited because those operators who were not on the bid list but who had seniority were allowed to scratch up.

[5]  Even if the relevant period were extended to two years before the EEOC filing, 42 U.S.C. § 2000e5(e)(3)(B), the court would find that the EEOC has not set forth discrete acts of discrimination with respect to scratch-up pay with sufficient specificity.  The EEOC contends that Ms. "Foster did not have any scratch-up hours between 2002 and August, 2005."  Doc. 54 at 11, ¶ 58.  Without any evidence of comparability, that Ms. Foster was passed over on specific occasions during that period and that similarly situated men were not, the EEOC has not made out a prima facie claim.

Qualification training enables an operator to advance permanently to a higher classification of equipment.  Doc. 47 at 12, ¶ 37.  The CBA governs opportunities for qualification training.  Doc. 47 at 12, ¶ 37.  Employees on the "Bid List" are eligible for qualification training.  Doc. 47 at 13, ¶ 38.  When a vacancy occurs, SJCC will first try to fill that position with an operator who is already qualified, and must choose the most senior qualified employee on the "Bid List."  Doc. 47 at 13, ¶ 38.  If not enough operators are qualified, SJCC will offer qualification training.  Doc. 47 at 13, ¶ 41.  The Assistant Superintendent of the San Juan Mine determines when to offer qualification training to the most senior operators on the Bid List.  Doc. 47 at 13, ¶ 39; Doc. 54 at 19, SF 39.  This decision is based on factors such as whether there are already enough qualified A operators to fill any permanent vacancies, and the need for more A operators during particular shifts or days.  Doc. 47 at 13, ¶ 40; Doc. 54 at 19, SF 40.  Permanent vacancies for A operators are extremely rare.  Doc. 47 at 13-14, ¶ 42; Doc. 54 at 19, SF 42.

The EEOC alleges that SJCC discriminated against Ms. Foster by delaying her Operator A classification training until 2008 even though she bid for the training in 2002.  Doc. 54 at 27-28.  Ms. Foster was denied training opportunities on A loaders, the EEOC claims, while "male employees have received development and training opportunities so that they are able to timely reach classification as operator A."  Doc. 47, Ex. A at 4.  The EEOC does not challenge

-25-

Ms. Foster's failure to pass qualification training, Doc. 54 at 28 n.7, but still argues that her eventual qualification training does not negate the harm she suffered because of the delay.  Doc. 54 at 28-29.

During the relevant 300-day window, no permanent vacancies for A operators occurred, nor did SJCC offer qualification training for A operators to anyone on the Bid List.  Doc. 47 at 14, ¶ 43; Doc. 54 at 19, SF 43.  In April 2005, at the beginning of the 300-day window, Rosie Foster was the second most senior non-qualified operator at the San Juan Mine on the A operator Bid List, and the fourth most senior non-qualified operator at all mines.  Doc. 47 at 14, ¶ 45 & Ex. H; Doc. 54 at 19-20, SF 45.  Jay Yazzie was the most senior non-qualified operator on the Bid List at the San Juan Mine.  Doc. 54 at 28.  As of February 8, 2006, when the administrative charges were filed with the EEOC, two employees senior to Ms. Foster at the San Juan Mine were also on the Bid List for A operator: a male, Emerson Mason, and a female, Sandra Lamone.  Doc. 47, Ex. H at 4.  SJCC offered Operator A qualification training for in early 2007 to the most senior non-qualified night-shift employee on the Bid List, Robert Hawkins.  Doc. 47 at 14, ¶ 46; Doc. 54 at 20, SF 46.

The EEOC has failed to make out a prima facie case of discrimination because it has not shown an adverse employment action or that SJCC differently treated similarly situated male employees.  First, given that the relevant time period for evaluating delay commenced on April 15, 2005, the date when Ms.

Foster originally bid for the A operator position is irrelevant.  Second, SJCC's delay in giving Ms. Foster qualification training is not an adverse employment action in light of her failure to qualify when she finally received the training in 2008.  Doc. 47 at 15, ¶ 49.  The EEOC cannot show that the delay harmed her if she failed to qualify after one week of classroom training and *six weeks* of field training on the A Loader.  Doc. 47 at 12, ¶ 37; Doc. 54 at 19, SF 37.  Further, another female with negligible experience on A loaders, Emma Curley, went through qualification training with Ms. Foster.  Ms. Curley passed the training despite her lack of experience before the qualification training.  Doc. 47 at 15, ¶ 49; Doc. 54 at 20, SF 49.  The EEOC has not established an adverse effect on Ms. Foster's employment.

Alternatively, the EEOC cannot show disparate treatment.  Ms. Foster had to wait for qualification training along with a male operator.  Jay Yazzie was a non-qualified male operator at San Juan Mine on the Bid List for Operator A qualification training as of April 15, 2005.  Doc. 47, Ex. H. at 3.  (Although not relevant, Mr. Yazzie was on the Bid List since 2003 — almost as long as Ms. Foster.  Doc. 54 at 5, ¶ 22).  Like Ms. Foster, Mr. Yazzie was still waiting for qualification training when the New Mexico Commission on the Status of Women filed its complaint with the EEOC on February 8, 2006.  Doc. 47, Ex. H at 4.  When SJCC offered training to Mr. Yazzie in 2008, it also offered training to Ms. Foster.  Doc. 47 at 15, ¶ 48; Doc. 54 at 20, SF 48.  SJCC treated both employees

similarly because it offered them both training when it deemed training necessary.

The EEOC argues that Mr. Yazzie is not similarly situated to Ms. Foster because he never complained about a lack of skill development, he had opportunities to train on the A loader, and he was ultimately qualified on the A loader. Doc. 54 at 28. None of these circumstances legally differentiates Ms. Foster's delay from Mr. Yazzie's delay. First, the EEOC does not explain, and this court does not see, how Ms. Foster's complaining distinguishes her delay. Second, as proof of Mr. Yazzie's opportunities to train on the A loader, the EEOC offers only his deposition testimony that he had "run these other loaders before and the small loaders, and I believe that's the only reason I had a little upper hand on [the female trainees]." Doc. 54, Ex. 11 at 43:25-44:5. Mr. Yazzie's belief about his successful performance simply does support address whether SJCC offered him more training opportunities than it offered Ms. Foster. Nor does it show disparate treatment. Third, the operators' relative outcomes from the qualification training really is not relevant to the question of disparate treatment in this comparison, as the EEOC seems to acknowledge. See Doc. 54 at 28 n.7.

The EEOC also mentions Harry Bennally's speedy qualification as an A operator, presumably as a case of disparate treatment. Doc. 54 at 5, ¶ 21; Doc. 47, Ex. A at 4. This example is outside the relevant 300-day window. But even so, it still does not show disparate treatment. Mr. Bennally added his name to the Bid List for A operator in February 2007, received task training as an A operator,

and was deemed qualified in October 2007.  Doc. 54 at 5, ¶ 21.  The briefs and

evidentiary materials do not clarify whether Mr. Bennally received qualification

training.  Doc. 54 at 5, ¶ 19 &  Ex. 15.  They only establish that he was deemed

qualified—a fact that has no bearing on Ms. Foster's goal of qualification

training.  Regardless of whether Mr. Bennally received qualification training, he

was not similarly situated to Ms. Foster because he had 11 more years of seniority

than Ms. Foster.

Finally, even if the EEOC could make out a prima facie case of

discrimination based on Rosie Foster's delayed qualification training, it does not

successfully rebut SJCC's legitimate, nondiscriminatory reasons.  SJCC did not

offer qualification training to anyone during the 300-day window because "it had

a sufficient number of qualified operators to meet anticipated business needs."

Doc. 47 at 14, ¶¶ 43-44, at 32; Doc. 54 at 19, SF 43-44.  In response, the EEOC

attempts to cast doubt on whether SJCC had a sufficient number of operators.

The number of backup operators qualified as A operators had fallen below the

range normally desired by the Assistant Mine Superintendent.  Doc. 54 at 33.

Therefore, the EEOC argues, SJCC's claim that it had enough operators for

anticipated business needs is "false and a pretext for discrimination."  Doc. 54 at

33.  This evidence is not sufficient to suggest that SJCC's justification is false.

The Assistant Superintendent did not testify that his target number was a hard-

and-fast minimum, but rather "just kind of the max and min, train up to six and

-29-

then drop back down, get back down to four *or less*."  Doc. 54, Ex. 19 at 160:2-4

(emphasis added).  SJCC as an employer was free to determine that the costs of

qualification training, at that time, outweighed the benefit of having more than

one backup operator.  That SJCC did not meet a flexible number is not sufficient

evidence of pretext.  See  EEOC v. Flasher Co., 986 F.2d 1312, 1322 n.12 (10th

Cir. 1992).  Because the EEOC either has not made out a prima facie case for

discrimination based on Rosie Foster's delayed qualification training, or has not

rebutted SJCC's legitimate, nondiscriminatory explanation, this claim fails.

    v. Other Allegations

    The EEOC has made clear that its allegation regarding a promotion to a

"lead person position" is not an independent discrimination claim, but only

"background evidence of gender bias."  Doc. 54 at 25 n.6.  Because there is no

hostile work environment claim and the EEOC has not shown how the allegation

is relevant to other claims, it is irrelevant.  Similarly, the EEOC has failed to

connect stray comments about Ms. Foster overheard by other employees, Doc. 54

at 13-15, to other claims of discrimination within the appropriate time period.[6]

---

[6]  The court recognizes that Ms. Steigelman testified as to her subjective
belief that SJCC discriminates based upon gender in work assignments based
upon her experience as an operator and a production supervisor.  Doc. 54 at 14-
15, ¶¶ 83-84.  This evidence simply does not constitute significantly probative
evidence tending to suggest discrimination against Ms. Foster based upon gender
within the 300-day period.  As an operator, Ms. Steigelman complained that
another employee (Woody Moore) displaced her from operating certain equipment
(continued...)

The EEOC alleges that Ms. "Foster continues to be denied overtime opportunities given to men." Doc. 54 at 11, ¶ 61. The EEOC offers little to support a prima facie case: "[A]lthough Harry Bennally works a schedule similar to Foster, he gets more overtime than she does on a monthly basis." Doc. 54 at 11, ¶ 61. And "if Foster was task trained on the trucks used in Coal Haul operations, she could be used for overtime opportunities when extra people are needed in coal haul." Doc. 54 at 11, Ex. 62. The EEOC put forth three such allegations in its answers to interrogatories requesting the factual basis of its claims, alleging that SJCC gave overtime to male employees on certain dates but not Ms. Foster, but these occasions all fall outside the 300-day window. See Doc. 47, Ex. A at 8.

Moreover, as SJCC points out, the Monthly Overtime Reports not only show Mr. Bennally receiving more overtime than Ms. Foster, but also "that for every month listed there were some men who worked less overtime than Foster, but were higher on the overtime list." Doc. 58 at 7. During some months,

---

[6](...continued)
based upon seniority and suggested that the employee would not have done that had it been a male operator. Doc. 54, Ex. 12 at 89-92. Yet SJCC can hardly be faulted for adhering to its stated basis for making these opportunities available including seniority and feasibility. Ms. Steigelman also indicated that the other male supervisors did not select female operators to work on heavy equipment, although she attempts to rotate all of her operators through different jobs. Doc. 54, Ex. 12 at 122. When pressed, however, she admitted that her belief was based upon her observations of women operating trucks more often than other equipment. Doc. 554, Ex. 12 at 122.

another woman, Emma Curley, even worked more hours than Mr. Bennally. Without more, the type of random comparison suggested by the EEOC is insufficient to draw an inference of discrimination without additional evidence suggesting that the alleged phenomenon of inequality exists regarding the relevant group of employees (those receiving overtime).   The EEOC's overtime allegations lack enough information to demonstrate an adverse employment action or disparate treatment.

NOW, THEREFORE, IT IS ORDERED, ADJUDGED and DECREED that Defendant San Juan Coal Company's Motion for Summary Judgment filed April 9, 2009 (Doc. 46), is granted.

DATED this 26th day of January 2010, at Santa Fe, New Mexico.

*Paul Kelly Jr.*_____
United States Circuit Judge
Sitting by Designation

Counsel:

George R. McFall and Samantha M. Adams, Modrall Sperling Roehl Harris & Sisk, P.A., Albuquerque, New Mexico, for Defendant.

Loretta Medina, Senior Trial Attorney and Veronica A. Molina, Trial Attorney, EEOC Albuquerque Area Office, Albuquerque, New Mexico, and Mary Jo O'Neill, Regional Attorney and Sally C. Shanley, Supervisory Trial Attorney, EEOC Phoenix District Office, Phoenix, Arizona, for Plaintiff.